**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JEFFERY S. MORELAND, and | ) | Case No. 05-10519 |
| JO DARLENE MORELAND | ) | |
| | ) | |
| Debtors. | ) | |

<u>**MEMORANDUM OPINION**</u>

The United States Bankruptcy Administrator filed a motion to dismiss the Chapter 7 bankruptcy case of Jeffery S. Moreland and Jo Darlene Moreland (the "Debtors") as being a substantial abuse of the Bankruptcy Code under Section 707(b). For the reasons stated herein, the Court will grant the Bankruptcy Administrator's motion and dismiss the Debtors' bankruptcy case.

**I. BACKGROUND**

From August 1991 to March 2004, the male Debtor was employed in Greensboro, North Carolina, in a position that required him to oversee a Wendy's franchisee that operated 36 restaurants and employed approximately 1,300 people. In 2003, the male Debtor reported a gross income of $96,673. The female Debtor works as a retail merchandiser and earns about $1,380 each month. From the Debtors' joint tax returns, the following information is evident:

| Year | Gross Wages | Tax Refund |
|------|-------------|------------|
| 1999 | $ 84,752 | $1,327 |
| 2000 | $ 87,852 | $1,908 |
| 2001 | $101,890 | $ 532 |
| 2002 | $110,664 | ($7,450) |
| 2003 | $109,291 | $2,286 |
| 2004 | $ 72,411 | ($ 827) |

The male Debtor testified that his job overseeing the restaurants owned by the Wendy's franchisee was generally stressful. In March 2004, a particular "incident" occurred at one of his stores, and the incident caused his stress level to enervate his ability to cope rationally. The alleged "incident" involved a disgruntled manager that held an after-hours party at a Wendys's restaurant

for which the male Debtor was ultimately responsible. Photographs of the party were sufficiently scandalous to garner national media attention. The male Debtor testified that the pressure placed on him by his employer and the media because of the "incident" overcame his fortitude; without warning, he got in his automobile and drove west, eventually stopping in Oklahoma. He left North Carolina without telling anyone – even his wife of fifteen years. A week later, he telephoned his wife from Oklahoma, explained his actions, and came home. Although the male Debtor was able to reconcile with his spouse, his employer was unwilling to condone his behavior and terminated his employment.

Shortly thereafter, the male Debtor's father fell seriously ill. The male Debtor was present to administer to his father's needs until his passing on June 18, 2004. The male Debtor also became ill – without medical insurance – and had outstanding medical bills of approximately $10,900 as of the petition date.

Meanwhile, following the male Debtor's job loss, the Debtors' significant amount of unsecured debt continued to mount. On Schedule J, the Debtors reported total monthly expenses of $4,793.00, which amount is exclusive of any unsecured debt payments. With the male Debtor out of work, the Debtors did not have enough money to pay their living expenses. Indeed, the female Debtor's paycheck was insufficient to cover their $2,142 monthly mortgage payment. To deal with the situation, the male Debtor liquidated his retirement savings;[1] the Debtors borrowed money from family members;[2] the Debtors held yard sales; and the male Debtor bought, reconditioned, and sold foreign-make automobiles. The Debtors also placed a significant amount of their living expenses on credit cards. The Debtors testified that they believed that the male Debtor would soon find work. They continued to pay their bills during the male Debtor's period of unemployment, usually making only the minimum payments on their credit card balances, but occasionally making slightly more than the minimum payments.

In August 2004, approximately five months after the male Debtor was terminated from his previous job, he secured new employment overseeing a franchisee that operated numerous Taco Bell

---

[1] The male Debtor liquidated a 401(k) account containing $13,318.00.

[2] The Debtors obtained a $6,000 loan from a relative but are not sure if they repaid it.

restaurants.  His new job, however, was located in Knoxville, Tennessee, and it paid him $65,000 annually – a substantial salary but only approximately two thirds of the salary that he earned in his previous position.  The Debtors are continually hopeful that the male Debtor will be able to find a job near their residence in High Point, North Carolina, and neither of them wishes to move to Tennessee.  In his current position, the male Debtor works in Tennessee during the week; when in Tennessee, he stays with family members and pays them $300 each month.

Although the Debtors have been relatively affluent over the past few years, they amassed a considerable amount of unsecured debts over the same period of time.  According to Schedule F, filed on February 18, 2005, the Debtors owe their unsecured creditors $139,639, which mainly consists of outstanding balances on seventeen credit cards.  Only a few of the Debtors' credit card statements were submitted into evidence because the Debtors testified that they shredded all statements after they received the bill.[3]  However, some of the Debtors' most recent credit card bills were produced, and the Debtors testified extensively regarding their credit card debt; this evidence may be summarized as follows:

| Card Issuer | Interest Rate | Opened | Amount |
|---|---|---|---|
| Discover | — | 1989 | $ 9,252.00 |
| JC Penny | — | 1990 | $ 1,346.00 |
| Sears | — | 1995 | $ 3,400.00 |
| Dillards | — | 1996 | $ 3,000.00 |
| Wells Fargo | — | 1997 | $ 4,650.00 |
| Providian | 18.24% | 1998 | $ 6,981.00 |
| Capital One | — | 2000 | $ 1,700.00 |
| CitiBank | — | 2000 | $ 4,475.00 |
| Citi Financial | — | 2000/2001 | $ 5,766.99 |
| AT&T Universal | 29.24% | 2001 | $13,000.00 |
| Capital One | — | 2001 | $ 1,910.00 |
| Chase | 27.24% | 2002 | $ 6,250.00 |
| American Express Blue | — | 2002 | $ 5,275.00 |
| Bank of America | — | 2003 | $   815.32 |
| MBNA | — | 2003 | $36,700.00 |
| Bank of America/Fleet | — | 2003 | $ 9,100.00 |
| Bank of America/Fleet | — | 2003 | $ 6,076.00 |

[3] The Court does not know if the parties made an effort to obtain relevant credit card statements from the credit card companies themselves.

-3-

Although the relevant credit card records were not submitted in evidence, the male Debtor testified that when they purchased their home[4] in High Point, North Carolina, in 1997 the Debtors had relatively little unsecured debt. The Debtors' asset-to-debt ratio was sufficient to allow them to purchase a home by borrowing approximately $178,000. Thus, although no specific evidence was presented as to the amount of the Debtors' credit card debt in 1997, the amount could not have been significant since the Debtors qualified for a mortgage loan. Over the next few years, however, the Debtors consumed the equity in their home, including any appreciation in value, through refinancing their first mortgage and obtaining second mortgages. At the time of the Debtors' filing, they owed their mortgage creditors approximately $243,000,[5] even though the Debtors testified that they had never missed a payment on a debt secured by their home prior to the bankruptcy. After adding the cost of taxes and insurance, which are not held in escrow by the mortgage lender, and the second mortgage payment, the Debtors' monthly housing expense is $2,604,[6] which is approximately fifty-two percent (52%) of the Debtors' net monthly income.

The Debtors filed their Chapter 7 bankruptcy on February 18, 2005. At that time, the Debtors had monthly income of $4,977.49 and monthly expenses of $4,793.00. Since then, the male Debtor has received a raise of approximately $2,000 per year.

## II. DISCUSSION

The Bankruptcy Administrator alleges that the Debtors are substantially abusing the Bankruptcy Code because they have amassed an unreasonable amount of unsecured debt and have substantially increased their secured debt; in short, the Debtors have a history of spending wantonly. The Bankruptcy Administrator argues that the Debtors' budget is unreasonable and that their house is more than they can afford. Finally, the Bankruptcy Administrator argues that the Bankruptcy Code

---

[4] The Debtors have a 2,700 square foot house with four bedrooms and two and one half bathrooms. It is located on a 3.7 acre lot. The Debtors have no children or dependents.

[5] The Debtors' Schedule A indicates that their home is worth $240,000.00. Although the Debtors testified that they believe that they have no equity in their house, they have not employed professionals to sell the house or value it.

[6] On Schedule J, the Debtors stated that their monthly mortgage payment was $2,142.00 and that they paid monthly taxes of $188.00 and monthly insurance premiums of $74.00. The Debtors testified that the monthly payment on the second mortgage is $200.00.

should not be used to afford the Debtors a discharge of those debts without making some effort to repay their creditors through a Chapter 13 plan.   The Court agrees.

Section 707(b) of the Bankruptcy Code provides that a court may dismiss a case filed by a Chapter 7 debtor, whose debts are primarily consumer debts, if the court finds that granting the debtor relief would be a substantial abuse of the Bankruptcy Code.  11 U.S.C. § 707(b).  The burden of proving substantial abuse rests on the moving party.  In re Vansickel, 309 B.R. 189, 213 (Bankr. E.D. Va. 2003).  There is a statutory presumption in favor of granting the relief requested by the debtor in determining whether to dismiss a case.  11 U.S.C. § 707(b).   As the leading treatise on bankruptcy states:

> [T]he statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case. . . .  It appears that the presumption is an indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.

6 Collier on Bankruptcy ¶ 707.04[5][a], p. 707-27 to 707-28 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. 2004).  See also Harris v. United States Trustee (In re Harris), 279 B.R. 254, 259 (BAP 9th Cir. 2002)(noting that the lack of clarity in § 707(b) was akin to inspired tergiversation and concluding that the burden of proof necessary to overcome the presumption was not "clear abuse," but was one of "substantial abuse" as stated in the statute).

Abuse of the Bankruptcy Code occurs under Section  707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start."  Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991)(providing that § 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, 2001 Bankr. LEXIS 1896 at *5 (Bankr. M.D.N.C. 2001)("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers.").  Likewise, a "substantial abuse" may occur when a debtor attempts to use Chapter 7 to obtain court condonation of irresponsible excesses incurred through years of living beyond the debtor's means.  E.g., In re Goodson, 130 B.R. 897, 903 (Bankr. N.D. Okla. 1991)("Here, the Court has before it an upper-middle class white-collar worker who has little or no self-control and begs for the Court to

-5-

condone his excesses. When other alternatives are available, as in this case, it would be unconscionable for this Court to grant the Debtor a discharge of his debts pursuant to Chapter 7.").

In the Fourth Circuit, a "totality of the circumstances" test is used in making a determination of substantial abuse under Section 707(b) because it is consistent with Congressional intent to punish the abusers of the Bankruptcy Code and with the statutory presumption in favor of granting the relief requested by a debtor. Green, 934 F.2d at 573. Some of the relevant factors to be evaluated in the "totality of the circumstances" approach include:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

Id. at 572 (citations omitted). The Fourth Circuit has also stated "that the majority of the cases hold that the debtor's ability to repay is the primary factor to be considered." Id.   The purpose of exploring the abovementioned factors is to "exemplif[y] the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." Id.

Of the abovementioned, nonexclusive factors, the Court acknowledges that the bankruptcy petition was precipitated, at least in part, by the male Debtor's loss of his job. Apart from the Debtors' housing expenses, as further detailed below, the Debtors have proposed a reasonable family budget pursuant to Schedule J. No significant inaccuracies were noted on the Debtors' petition and schedules. Likewise, vestiges of good faith are present inasmuch as the Debtors liquidated assets prior to their bankruptcy that could have been declared exempt, and they made efforts to keep their bills current during a time of financial hardship.

Under the totality of the circumstances, however, these facts are insufficient to forestall a finding that the Debtors' Chapter 7 petition is a substantial abuse of the Bankruptcy Code.

**A.  Excessive Housing Expense**

Apart from the Debtors' housing expense, there is no dispute between the parties that the Debtors' budget, as shown on Schedule J, is reasonable. The Bankruptcy Administrator argues,

however, that the housing payment alone renders their budget unreasonable and that, given the Debtors' current income, their home is just too expensive. The Debtors argue that their home has no equity, they cannot afford to sell it, and they cannot afford to move.

A debtor's budget may be unreasonable or excessive based on a high mortgage payment. E.g., Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541(M.D.N.C. 2004)(finding that the debtors earned $7,804.11 in net monthly income and that a mortgage payment of $3,349 on a $415,000 house was unreasonable in that it manifested a desire to hold on to a station in life that seemed to precipitate the bankruptcy in the first place); Schmonsees, 2001 Bankr. LEXIS 1896 at *12-13 (holding that mortgage payments of $2,450 on a $290,000 four-bedroom home in an upscale neighborhood occupied by two people was excessive when the debtor and his non-filing spouse earned a net pay of $5,400 per month); In re Engskow, 247 B.R. 314, 317 (Bankr. M.D. Fla. 2000)(stating that mortgage, taxes, and insurance expenses of $2,184.53 were excessive when the debtor's net income was $3,548.40 and when the debtor did not include the income of his spouse on the schedules); United States Trustee v. Duncan (In re Duncan), 201 B.R. 889, 896 (Bankr. W.D. Pa. 1996)(finding a mortgage and utility expenses consuming 89% of the household budget was unreasonable and unconscionable, considering the debtor was attempting to wipe out nearly $224,000 in unsecured indebtedness). Cf. Vansickel, 309 B.R. at 199-200 (finding that $2,300 per month in rent was not excessive for a family of four in a three-bedroom townhouse when the debtor's net income was $5,287 per month); In re Hammed, No. 04-53282, 2005 Bankr. LEXIS 1096 at *18 (Bankr. M.D.N.C. April 22, 2005)(finding that a $1,740 mortgage payment for a family of five that constituted 31% of the budget was not unreasonable); In re Parker, 04-12747, 2005 Bankr. LEXIS 1086 at *19-20 (Bankr. M.D.N.C. Jan. 25, 2005)("Given the length of time that the Debtor has owned her home, the size of her family, the relative cost of alternative housing, and the relatively modest living conditions of the Debtors, the Court is convinced that the Debtor did not inflate her homestead costs in an effort to live an indulgent and luxuriously lifestyle at the expense of her unsecured creditors.").

In considering whether a housing expense is excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing. Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead. See, e.g., 11

-7-

U.S.C. § 524(d)(2)(providing that a court is not required to ascertain whether a reaffirmation of a consumer debt secured by the debtor's real property would result in an undue hardship on a debtor or whether it would be in the debtor's best interest).

In this case, the Debtors purchased their home in 1997 by borrowing approximately $178,000. Although the Debtors live alone and do not have any children, the house is located on 3.7 acres of land, has four bedrooms, and has 2,700 square feet of living space. According to the testimony of the female Debtor, the value of homes in the area is not increasing and their home is not worth the $243,000 currently secured by its value. As stated, the Debtor's monthly mortgage payments, insurance, and taxes total $2,604, or approximately fifty-two percent (52%) of the Debtors' net monthly income. Although the percentage of the Debtors' budget used to pay housing expenses is not a bright line test, the large percentage in this case, especially when combined with the confluence of at least four other factors, make the Debtors' housing expense excessive.

First, the Debtors testified that they have no equity in their home. The female Debtor testified that their mortgage company would not approve a sale where its lien would not be not paid in full at closing. What the Debtors have ostensibly overlooked, however, is that they may surrender the property to their secured creditors at any time. Any deficiency judgment could be addressed by the Debtors in a subsequent Chapter 13 petition, which the Debtors are still eligible to file notwithstanding the fact that the Court is dismissing their current case.

Second, the Debtors indicated that they would be willing to sell their home if able, and the female Debtor stated that she even investigated the price of homes in her neighborhood to determine if selling was feasible. Thus, the Debtors apparently do not have such long-standing traditional ties to their homestead that no amount of money would ever be sufficient to convince them to leave.

Third, the Debtors do not have any children and have a four bedroom, 2,700 square foot home. No unique circumstances exist whereby this large amount of space is needed and no particular characteristics of the home were elicited whereby it was particularly adapted to use by the Debtors.

Fourth, the Debtors stated that they could not move from their present home on the basis that it would be too expensive to leave. The male Debtor apparently suffers from a permanent partial disability and cannot lift heavy objects. The female Debtor obtained a quote from North American

Van Lines stating that it would cost $9,670 to move the Debtors to Tennessee, where the male Debtor's current job is located.  The female Debtor stated that they could not afford to pay the movers, much less any up-front costs of leasing an apartment.  Moreover, the female Debtor lamented at they would not qualify to rent a "decent" apartment because their credit was ruined due to their bankruptcy filing.  On the other hand, according to IRS guidelines, a family of two should be able to obtain housing in Guilford County[7] for no more than $1,084 per month.  When compared to the Debtors' current $2,604 housing expense, the extra money could be used to smooth over any credit problems that the Debtors may have in renting an apartment.  With estimated savings of $1,520 per month, or $18,240 per year, the Debtors can scarcely afford not to move.

Accordingly, the Court finds that the Debtors' housing expense is unreasonable because their housing expense consumes a large percentage of their monthly income, the home does not have any equity, the Debtors have expressed a willingness to sell their home if they are able, the large size of the home is not necessary to support their reasonable needs, and the Court is not convinced by the Debtors' arguments that moving is too expensive.

**B. Ability to Repay Debts**

The Bankruptcy Administrator asserts that if the Debtors were to obtain more affordable housing, then the Debtors would be able to repay some of their debts.  Pursuant to Schedules I and J, the Debtors already have a $184 monthly budget surplus.   The Debtors, however, contend that they do not have any ability to repay their debts through a Chapter 13 plan inasmuch as they met with the Chapter 13 trustee's office and were told that to propose a twenty-five percent (25%) plan they would have to make a monthly plan payment of $1,338.

An appropriate method of evaluating whether a debtor has the ability to repay debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. E.g., Shaw, 310 B.R. at 541 ("In contrast with the second factor of the 'totality of the circumstances' test, where 'ability to repay' analyzes the debtor's historical ability to repay debts, 'ability to repay' in this context analyzes the degree to which the debtor could pay creditors a significant portion of the debt under a Chapter 13 plan.").  Although a number of courts have considered the percentage of total

---

[7] Guilford County, North Carolina, is the county where the Debtors currently reside.

indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test. As stated by one bankruptcy judge:

> While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000)

After adjusting the Debtors' budget to reflect a more reasonable housing expense, the Court is convinced that the Debtors could repay a significant portion of their unsecured debts in a Chapter 13 plan. As stated, the Court believes that the Debtors could obtain alternative housing for $1,084 per month, which would result in an additional $1,520 in monthly disposable income. Pursuant to Schedules I and J, the Debtors already start with a budget surplus. Additionally, the male Debtor testified that he had received a post-petition raise of $2,000 per year, and expectations are that the Debtors' income will increase in the future. While repayment of twenty-five percent (25%) or more of a debtor's unsecured indebtedness is encouraged in this District for Chapter 13 plans, plans that pay less are also approved, especially when a debtor is committing all of the debtor's projected disposable income to a plan consistent with the requirements of Section 1325(b)(1)(B). Accordingly, the Court finds that the Debtors have the ability to repay a substantial portion of their debts through a Chapter 13 plan.

## C. Cash Advances and Consumer Purchases Far in Excess of Ability to Repay

The Bankruptcy Administrator contends that the Debtors incurred about $130,639 in unsecured debt and incurred up to $65,000 in home equity loans without any meaningful attempt to repay unsecured creditors. In response, the Debtors state that they made various home improvements with a portion of the home equity loans. The Debtors also contend that they did not make consumer purchases or take cash advances far in excess of their ability to pay; in support of their position, the Debtor point out that (a) they have not missed any mortgage payments prior to filing bankruptcy, (b) a significant portion of the unsecured debts were incurred due to several months of unemployment, (c) they made consistent and timely payments on their credit card bills, and (d) they had a relatively high annual income at the time that much of their unsecured debt was incurred.

-10-

A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with the Debtor's reasonable expectations of repayment at the time the debt was incurred.  Vansickel, 309 B.R. at 211.  Indeed, nearly all debtors in bankruptcy have incurred obligations in excess of their ability to repay, and the bankruptcy court is mandated to adhere to the statutory presumption that a debtor is entitled to the relief originally sought.  11 U.S.C. § 707(b).  Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns – all of which must be considered in light of whether a debtor is taking unfair advantage of creditors.  Vansickel, 309 B.R. at 211.

In this case, the Court is hampered in its effort to determine exactly what the Debtors purchased or what cash advances were made because the Debtors failed to keep any financial records.  By itself, the Debtors' failure to keep adequate records could be grounds for denying them a Chapter 7 discharge.  11 U.S.C. § 727(a)(3) ("The court shall grant a debtor a discharge unless . . . the debtor has . . . failed to keep or preserve any recorded information . . . from which the debtor's financial condition or business transactions might be ascertained . . . .").  When questioned by the Bankruptcy Administrator about their finances – both recently and over the past several years – neither Debtor seemed to have a grasp on what they purchased nor exactly how their money was spent.  The Court found the testimony of both of the Debtors in this regard to be evasive, defensive, and, overall, incredulous.[8]  The parties stipulated, however, that the debts were primarily consumer debts, and the only issue under this factor is whether those purchases were far in excess of their ability to repay.

As of the petition date, the Debtors had managed to accumulate $130,639 in unsecured debts.  Even subtracting the $10,900 incurred for uninsured medical expenses, and even indulging the Debtors' contention that unsecured debts incurred during the male Debtor's period of unemployment

---

[8] For example, the Bankruptcy Administrator asked the female Debtor about the source of a $1,340 deposit to the Debtors' checking account in October 2004, less than one year ago.  She stated that she did not know where the money came from or how it got there.

should be removed from the analysis, the Debtors still would have amassed more than $95,000[9] in unsecured debt and an additional $65,000 through refinancing or home equity loans before the male Debtor's job loss.  Although the Debtors argue that they had the ability to repay their debts before the male Debtor lost his job, they obviously had failed to do so and all the evidence suggests that the Debtors continued to accrue an increasing amount of debt from 1997 to the present despite earning a relatively large annual income.

The Debtor's arguments that they did not make consumer purchases far in excess of their ability to repay them may be quickly disposed.  Any home improvements made through refinancing or home equity loans apparently did not benefit the secured lenders inasmuch as the female Debtor testified that their secured creditors were undersecured notwithstanding nearly eight years of timely payments.  Also, paying a mortgage timely when other debts continue to mount is merely preferring secured creditors over unsecured creditors.

The Debtors also contend that they were paying their debts as they became due inasmuch as they timely made payments on their unsecured debts – sometimes paying more than the minimum balance – until the time that they filed bankruptcy.  Paying the minimum balance on a credit card – or even something more than the minimum balance – dos not demonstrate an ability to repay debts.  The male Debtor testified that their unsecured debts were significantly less in 1997, and based on the evidence presented, the upward trajectory of the total amount of unsecured indebtedness was never corrected as the Debtors continued to spend their way to bankruptcy.  Although the male Debtor's job loss was a factor in the filing of this bankruptcy, the foundation for the filing was already firmly established.

Finally, the Debtors enjoyed a relatively high income for a number of years and quite likely – on an objective basis – could have repaid their debts.  As discussed below, however, even though the Debtors had a sufficient cash flow for many years to repay their debts, they failed to do so, which

---

[9] The Debtors scheduled $130,639 in unsecured debt as of the petition date.  Subtracting $10,900 for uninsured medical debt, and subtracting five months of living expenses (scheduled at $4,793 per month, exclusive of any unsecured debt payment) during the male Debtor's period of unemployment, equals $95,774.

-12-

is evidence of bad faith and weighs in favor of dismissing this case as a substantial abuse of the Bankruptcy Code.

The Debtors did not take cash advances and make purchases <u>far</u> in excess of their ability to repay.  On objective basis, the Debtors might have been able to implement some budgetary restrictions and repay their unsecured debts.  During the male Debtor's unemployment, the Debtors continued in the belief that the male Debtor would obtain new employment whereby they could – at least objectively – repay their obligations.  Although the objective ability may have been present, the evidence certainly demonstrates that the Debtors lacked the willingness to curtail their spending to repay their obligations.

**D. Good Faith**

The Bankruptcy Administrator states that the Debtors high amount of unsecured debt is evidence that the Debtors lived a luxurious lifestyle at the expense of their creditors and that if the Debtors ever had the ability to repay their debts, then the Debtors never exercised that ability.  The Bankruptcy Administrator argues that Chapter 7 of the Bankruptcy Code is not designed to condone years of irresponsible materialism.

An analysis of whether a petition was filed in good faith –  for purposes of a Section 707(b) motion – concerns whether a debtor is misusing the bankruptcy process to achieve some illicit purpose.  <u>Kestell v. Kestell (In re Kestell)</u>, 99 F.3d 146, 149-50 (4th Cir. 1996)(finding a "substantial abuse of the Bankruptcy Code when the debtor filed solely to discharge obligations owed to his former spouse – not any other creditor – because favoritism among creditors is antithetical to the bankruptcy process and the Bankruptcy Code is not to be used as a method of advancing personal antagonisms against an ex-spouse).  "Good faith" is defined as "a state of mind consisting in (1) honesty in belief or purpose, . . . or (4) absence of intent to defraud or seek unconscionable advantage."  <u>Black's Law Dictionary</u> 713 (8th ed. 2004).  <u>See also</u> <u>Stewart v. United States Trustee (In re Stewart)</u>, 175 F.3d 796, 810 (10th Cir. 1999)(finding that a physician's opting for a lower paying job, disregarding his family support obligations, and buying a $26,000 vehicle instead of paying for those expenses – among other things – was sufficiently analogous to the old adage of "having your cake and eating it too" as to call into question the debtor's good faith); <u>In re</u>

-13-

Dominguez, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994)("Presumably, "good faith" [within the meaning of § 707(b)] means subjective good faith.").

A history of living beyond one's means and then attempting to eliminate any resulting debt through bankruptcy is evidence of a lack of good faith and can constitute a substantial abuse of Chapter 7 of the Bankruptcy Code. E.g., In re Mooney, 313 B.R. 709, 714 (Bankr. N.D. Ohio 2004)(dismissing a Chapter 7 case as being a substantial abuse –  notwithstanding the fact that a period of unemployment helped precipitate the bankruptcy filing – because the debtors chose to "consistently live at or near the outer limits of their financial means."); In re Blum, 255 B.R. 9, 12-13 (Bankr. S.D. Ohio 2000)(maintaining a consistent lifestyle of living beyond the debtor's means constituted a substantial abuse of the Bankruptcy Code even when the debtor liquidated exempt assets in an effort to maintain that standard of living; § 707(b) imposes a rudimentary standard of fair play and honorable dealing on those tempted by unprincipled accumulation of consumer debt); In re Gyurci, 95 B.R. 639, 643-44 (Bankr. D. Minn. 1989)(dismissing a case for substantial abuse when the debtor sought to discharge unsecured debts relating to multiple credit cards that the debtor abused over five years in an effort to support an extravagant lifestyle); In re Ploegert, 93 B.R. 641, 644 (Bankr. N.D. Ind. 1988)(dismissing a case as being a substantial abuse, in part, based on the fact that "the debtor seeks only to gain relief from his past excesses. . . . [G]iven the debtor's profligate propensity to spend . . . the court is certain that the debtor must return, in the near future, in order to gain relief from habits he obviously has no desire or inclination to change."); In re Peluso, 72 B.R. 732, 738 (Bankr. N.D.N.Y. 1987)(finding that the debtor's destructive financial patterns did not have an end in sight and that the debtor's pattern of overextending his ability to meet his financial obligations was a factor in dismissing the case as a substantial abuse).

In this case, the Debtors' history of credit abuse, dating back to at least 1997, evidences an irresponsible materialism enjoyed through easy access to credit. For many years, the Debtors purportedly had the ability to repay their debts; instead, they continued to borrow more money and continued to allow the total amount of their unsecured indebtedness to swell beyond the breaking point. While the male Debtor's job loss precipitated this filing, the foundation for an eventual bankruptcy had already been laid. As the Debtors testified, their total amount of unsecured debt increased even though the Debtors' annual income increased. There is no inference in the record that

the upward trajectory of unsecured debt was ever corrected. Now, though this bankruptcy, the Debtors seek to terminate the obligations that they have incurred through years of irresponsible spending, without making any effort to repay a portion of their unsecured debts. Indeed, the Chapter 7 trustee in this case filed a report stating that there would be no distribution to creditors through a liquidation of the Debtors' non-exempt assets. Even if the percentage of repaid debt might have been small if the Debtors had filed under Chapter 13, allowing the Debtors to discharge all unsecured debts through a Chapter 7 proceeding undermines the principles behind the fresh start and constitutes a substantial abuse of the Bankruptcy Code.

### III. CONCLUSION

Giving due weight to the totality of the circumstances surrounding the Debtors' bankruptcy filing, the Court concludes that the Debtors' Chapter 7 petition is a substantial abuse of the Bankruptcy Code pursuant to Section 707(b) and will dismiss their case.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

A copy of the foregoing was served
electronically or conventionally to:

Michael D West

Everett B. Saslow, Jr.

Gerald S Schafer

Jeffrey S Moreland

Jo Darlene Moreland
4001 Preswick Ct
High Point, NC 27265

Charles M. Ivey